374

PALFUSS, Appellant, vs. CITY OF MILWAUKEE and another, Respondents.

*January 9—February 6, 1951.*

For the appellant there was a brief by *Otjen & Otjen* of Milwaukee, and oral argument by *Henry H. Otjen.*

For the respondents there were briefs by *Walter J. Mattison,* city attorney, *John J. Dolan,* first assistant city attorney, and *Clyde E. Sheets,* assistant city attorney, and oral argument by *Mr. Sheets* and *Mr. Dolan.*

FRITZ, C. J. The judgment under review was entered in accordance with the court's findings of fact and conclusions of law. The principal question on this appeal is whether the method and manner by which the construction of the Berryland project for veterans' housing was financed is authorized under the statutes of this state. Sec. 66.40 (4) (a), Stats., reads:

"When the council of a city by proper resolution shall declare at any time hereafter that there is need for an authority to function in the city, a public body corporate and politic shall then exist in the city and be known as the 'housing authority' of the city. Such authority shall then be authorized to transact business and exercise any powers herein granted to it."

Sec. 66.40 (5) (a), Stats., reads:

"When the council of a city adopts a resolution as aforesaid, it shall promptly notify the mayor of such adoption. Upon receiving such notice, the mayor shall, with the confirmation of the council, appoint five persons as commissioners of the authority. . . ."

And sec. 66.404 (2), Stats., provides:

*"Advances to Housing Authority.* When any housing authority which is created for any city becomes authorized to transact business and exercise its powers therein, the *governing body of the city, may immediately make an estimate of the amount of money necessary for the administrative*

*expenses and overhead* of such housing authority *during the first year thereafter,* and *may appropriate such amount to the authority out of any moneys in such city treasury* not appropriated to some other purposes. The *moneys so appropriated may be paid* to the authority *as a donation. Any city,* town or incorporated village *located* in whole or in part *within the area of operation of a housing authority shall have the power* from time to time *to lend or donate money to the authority* or to agree to take such action. The housing authority, when it has money available therefor, shall make reimbursements for all such loans made to it."

Sec. 67.04, Stats., provides:

"Municipalities are empowered to borrow money, subject to the general limitation of amounts prescribed by section 67.03, and subject in some specific cases to the further limitations prescribed by this section, and to issue bonds therefor, for the purposes enumerated in this section. Such bonds may be issued: . . .

"(2) Cities shall not borrow money or issue bonds therefor for any purpose except only those specified in this subsection, and subject to the general limitation of amounts prescribed by section 67.03, namely: . . .

"(zm) To acquire sites; to prepare, carry out, acquire, lease and operate housing projects for honorably discharged members of the armed services of the United States who served in any of its wars and who at the time of induction into such service were residents of the county in which the municipality is located and their families and dependents; to provide for the construction, reconstruction, improvement, alteration, and repair of any such housing project or any part thereof."

It is not contended that by the city incurring the additional indebtedness for money borrowed by it in its transactions involved in this case, its aggregate indebtedness will be in excess of the limitation prescribed by sec. 67.03, Stats.

It appears without dispute that after the enactment of sec. 66.404 (2), Stats., and the creation, as prescribed in sec. 66.40 (4) and (5), Stats., of the Housing Authority for

the city of Milwaukee, the city attorney's office interested a syndicate of investment bankers to attempt to sell revenue bonds issued by the Housing Authority. Representatives of the syndicate stated they believe that these bonds could be sold provided that there was an equity of at least one third in the housing project and that the bonds would represent two thirds of the value of the project. The city, under the authority granted by the above-quoted provisions in sec. 66.404 (2), Stats., made an outright donation of one third of the cost of the first veterans' housing projects called Northlawn and Southlawn, and Housing Authority issued revenue bonds for the balance of two thirds of the construction cost. These bonds carrying an interest rate of slightly over three and one quarter per cent were immediately sold by the investment bankers. This type of financing was called the "Milwaukee Plan," and in that manner three housing projects,—Hillside, Northlawn, and Southlawn,—were constructed and financed.

When the construction of the Berryland project for veterans' housing was proposed, Housing Authority recommended that it be constructed under the financial method used in financing said preceding projects. The Milwaukee city officials refused to follow that plan for the Berryland project, and directed that the city make a donation of one third of the cost of construction, and that, in lieu of Housing Authority revenue bonds with a three and one-quarter plus per cent interest rate, the city issue its own general-obligation bonds, which carried an interest rate of only one and one-quarter per cent. By this latter method of financing, it is claimed and apparently is undisputed that the saving of two-plus per cent on the Berryland project over the forty-year period of amortization of the debt means a savings of several million dollars in debt charges.

Sec. 66.404 (2), Stats., empowered the city to *lend* money and sec. 67.04, Stats., empowered the city to *borrow* mon-

ey,—subject to the general limitation of the amount prescribed by sec. 67.03, Stats.,—and to issue bonds therefor for purposes which, under sec. 67.04 (2) (zm), Stats., included the purpose, "To acquire sites; to prepare, carry out, acquire, lease, and operate housing projects for honorably discharged members of the armed services of the United States . . . ;" and to borrow said money for that purpose by issuing its general-obligation bonds. To secure the money thus loaned by the city to Housing Authority to pay two thirds of the costs of the Berryland project, Housing Authority gave the city a note for that amount secured by a mortgage to the city, and the debt is to be amortized in twenty years rather than forty years; and upon cancellation of the mortgage the entire Berryland project is to go on the tax roll and be assessed and full taxes are to be paid in the same manner as other property is assessed and taxed by the city. Under the Berryland financing plan Housing Authority has not and is not to issue any bonds and the credit of the city is not pledged for Housing Authority bonds. The general-obligation bonds are bonds by the city and are not the Housing Authority bonds, but are to raise money to loan to Housing Authority, which is expressly authorized by secs. 66.404 (2) and 67.04 (2) (zm), Stats., as quoted above. Consequently there is not at issue any question as to whether the city's credit is pledged for the Housing Authority bonds.

Appellant states in his brief that he does not contend that the voters' approval in the referendum at the spring election in 1948 of the issuance of bonds for $3,500,000 for veterans' housing projects shall be the final limit to which the city may go in the matter of such projects, but he does contend that if the officials wish to exceed the issuance of bonds for such projects they must refer the matter back to the people and secure an increased authorization. No statute or rule to that effect is cited by appellant. Under the provisions in sec. 67.05 (5) (b), Stats., which require the holding of a refer-

endum election before a city is permitted to issue bonds for purposes stated in that statute, there are exceptions as to certain specified purposes, including "veterans' housing projects." Consequently, the city is authorized to issue bonds for constructing such projects *without* a referendum unless there is filed, as provided in sec. 67.05 (7) (b), Stats., a petition signed by electors numbering at least ten per cent of the votes cast for governor in the city at the last general election, or there is, in the discretion of the city council, a resolution that there shall be a referendum. Consequently, as it does not appear, in relation to the Berryland project that such a petition by electors has been filed, or that the city council has adopted a resolution that there shall be a referendum, no such referendum vote is required.

*By the Court.*—Judgment affirmed.

HUGHES, J. (*concurring*). No question as to the constitutionality of any of the statutes involved is raised in this litigation. With the understanding that we have not inferentially passed upon such questions by this decision, I concur in all that the opinion says.

I am authorized to say that Mr. Justice MARTIN, Mr. Justice BROWN, and Mr. Justice GEHL concur in this opinion.